at all. If it pleases the Court, my name is Kent Brooks. I represent the appellant Ms. Wilkenson. In Amchem and to a greater extent in Ortiz, the Court, the Supreme Court, announced a concern with the non-adversarial presentation of settlement certification in fairness of a settlement agreement, and the purpose behind this concern was the protection of the rights of the non-named class members. This Court in Hanlon, Satan, and in Molsky has then proceeded to apply those concerns. What is required now is that the structure of the settlement agreement and the allocation plan, the structure itself, provide the proof of assurances that the requirements of 23A.4 and 23A, excuse me, E, are in fact established in the record. It's not that non-adversarial presentation. It is the documents. We now have something to look at. So as in this case there were 19 plaintiffs' counsels or firms, there were nine defendant manufacturers of cosmetics in eight major department stores. There were over 30 lawyers advocating on both plaintiffs and defendants that this was fair, that this was arm's-length negotiation. The Supreme Court and this Court has said, look at the structure of the documents to make that decision. Here the appellees say, well, there's two parts of the structure of these documents, the settlement agreement and the plan of distribution that you should look at. One is the value of the settlement at $175 million manufacturer-suggested retail price, and the other is the fact that each member is treated equally and that each member gets the benefit of the prospective injunction and has a one-in-five chance to get an $18 to $24 manufactured retail price product, I stress chance. What's the problem with the value of the settlement? Well, this Court has said, we look to see what is the evidence concerning the value of the penalty to the defendant in a settlement, because sometimes no matter what the value to the class is, if there's little penalty to the defendant, that is some indicia that must be overcome that indicates possible conflicts of interest, a degree of lack of vigor on the part of plaintiffs' counsel. Here the manufacturer-suggested retail price is used to value the settlement. However, these are the manufacturers of the product and, therefore, the penalty. While the proponents of the settlement didn't see fit to give the Court any information on what the cost to produce those products were, at least one of the objectors did put forth some information from which we can determine that this entire product preparation cost somewhere under $14 million, and then there's the $24 million worth of attorney's fees. We also have the problem that while the value of the settlement may be $175 million in manufacturer-suggested retail price, we have a Cypre provision, and under the projected take rates, we're going to have about $108 million minimum of the product won't be claimed and will provide a tax savings. When this is all looked at, the penalty to the defendants is slightly over $24 million. That's slightly more than the attorney's fees alone. Now, as to the problem that all members are treated the same, well, not all members have the same interest due to the damages or their product or store affinity. Some want one product. Some bought some more than one product, manufacturer's product. Some go to one or more stores. So the structure of treating them all the same doesn't assure that the treatment of the members with the greatest damages and with multi-transactions, they don't get what they would choose, because here they're not going to get the same benefits. Kennedy. Let me stop you right there. Sure. In the process of developing this settlement, were these issues discussed? Were they part of the settlement process? What we know is that what was discussed was the amount was determined first, the $175 million, and then the $1,000,000, and then the $1,000,000, and then the $1,000,000. So the question is, if any of these points were not part of the settlement process, I'd like to know, or if these points were part of the settlement process, they were discussed before, the treating of different parties and their relationship to the product. The portion that was discussed before the court or before the special master was the issue of whether or not the 2 to 7 percent projected take rate would then have enough product so that each person who truly attempted to claim one would be able to. Okay. And then the question about different status of different claimants, you know, somebody I bought one product and I bought five products, was that part of the discussion? Yes. As a matter of fact, the judge actually went through and in her first fairness here discussed the idea, well, if it's only 2 to 3 percent, then this many could possibly get it, but if it's as much as 7, then only so many others could get it, and if we use the one product per manufacturer, then that's a possibility of nine products per claimant, and then if you have a 7 percent take rate and each take nine. So, yes. That brings me to my total concern that I'm confused about. Maybe you'll help me. If that's the case, and if the judge finally approved the whole settlement, what are we doing now? You're doing the analysis that the Supreme Court has required and that the Court has done in both handling Stanton and in Molsky. Okay. And what are we doing? You are reviewing the record to determine if the settlement documents do, in fact, provide assurance through their structure of the adequacy of the representation and the fairness of the settlement. And what's the standard of review? It's the heightened standard and heightened scrutiny that you all have mentioned in Molsky of the abuse of discretion standard, and in both two of those cases, you all did find the abuse of discretion. So we have to find out whether the judge literally abused his discretion in approving the settlement. Those are the words that we as lawyers use, yes. Well, I hope we would, too. Yes. Okay. And so if we find that these particular points that you're raising were presented to special masters, were discussed, it all went through the process, and now we have a disagreement about what happened in that process. We look at that whole process under an abuse of discretion when the district judge approved it. Yes, sir. It's abuse of discretion, but you don't look at the discussion. You look at the results. Well, I'm just saying they were just – if nothing was ever brought up, then I don't know where we'd go from there. But we're talking about things that were already discussed during the settlement process that were presented to the judge as a fair settlement. These issues were presented by both sides at the fairness hearing. Thank you. So what you have also here is in addition to the little price or little penalty  that was presented to the district judge when the settlement was presented to the district judge, we have admitted that the members have varying numbers of transactions and that the members were customers or consumers of different numbers of the defendants. However, what happened is there was a failure to use identifiable categories of different claimants. And that's one of the factors that the Supreme Court has identified as being in addition that there may be impermissible conflicts of interest, therefore, for making the settlement improper. That's a mouthful. Now, tell me specifically what happened in this case. Okay. Because the entire discussion in the fairness hearings and for the special master talked in terms of that there were, in fact, people that had bought from one or more of the manufacturer's products or at one or more of the stores. It's easy to quantify the fact that there are identifiable claimants. You have some that are one-line purchasers, some that are two-line purchasers, some that are three-line purchasers. This is not a situation where those are hard to identify. And the Supreme Court has said you should normally have preliminary protections by virtue of having separate representation when those types of things, when those types of claims exist. Well, but you didn't fail in this plan, then. Sorry? Where does it fail in this plan specifically? Where did it fail in this plan specifically? There's a single group of plaintiffs' counsel, and no one was denominated to look out for those who had purchased at more than one or more than two or more than three or up to nine. This was just a group or unified group. Let me make sure I understand what this particular argument is trying to do. You're saying that there should have been separate representation for single purchasers compared to multiple purchasers? Yes. Upon Amchem? The case law indicates that in making the abuse of discretion standards, you would look to this issue. For instance — Okay. But focusing just on this argument, whether or not you need separate counsel, I guess that would be kind of a conclusion to looking at this issue, where the Supreme Court did this and found the settlement improper was where each individual member of the class potentially had huge amounts at stake. It was basically people who were ill already from asbestos exposure or people who might in the future become ill but were not yet showing symptoms. And there were lots of dollars involving life and death issues with respect to medical care for these people and dividing up those two classes. Here, I don't see the stakes as anywhere near as high. We're talking about do you get one, do you get nine cosmetic products valued retail manufacturers suggested retail price. I don't know what it's going to be. And are you trying to import into this cosmetic situation the analysis from the asbestos cases? Yes. Yeah. That's what I was afraid of in the sense that I'm not sure that I see that conflict as sufficiently severe as a structural matter for us to set it aside as abuse of discretion. I can point to the foundation of the Amchem and Ortiz cases. It's the rules enabling an act. It's we can't go so far away in using the class action vehicle to clear the courts of potentially the individual suits. We can't go so far away that we forget that what we're distributing is justice and that the rules enabling act is saying you need to have a very close match between what the outcome is in a class action. And that's not a rule of specific application related just to high stakes. But almost no matter how we structure a settlement we're not going to get a very close match in this case. That is to say this is a small stakes large scale class action at the most optimistic and I guess by optimistic I mean a high take rate. We're not going to get that many people coming back. We know that we're going to get some people signing off assuming this goes forward who never did anything. They'll just sign the piece of paper and say sure. I mean this is basically a CPRI settlement. Maybe it doesn't have that name but that's what it's going to be. Well once the amendment came into place that's exactly what it became. I think it was going to be a CPRI settlement anyway in fact. Well as a matter of fact with the estimates of the experts it looked as though in the first case and that was the district courts express concern was there weren't going to be enough products for those who actually did show up. I'm more interested actually in your argument. I think I'll call it a structural argument just as you call this sort of separate class or members of the conflict among the members of the class a structural argument. I just didn't call this one a structural argument too. It's one that you've already touched on and that is the inherent conflict that always exists in these cases between the class members and the attorneys representing them. That is to say how much is going out in fees here which looks like it's going to be roughly $24 million compared to how much as it were harm is done to the defendants. How much are the defendants really paying out? And your argument is the defendants really if you take if you net it all out in terms of how much it costs them to put the product in the stores in terms of some tax deduction they might get for the products that aren't in fact delivered during the week long period in terms of what other and you didn't mention this but it's in the papers in terms of whatever benefit they might get if the customer comes into the store to get the free product and the other things that they might do. You're saying that the actual net harm or pain suffered by the defendant is not much more than $24 million which means that virtually all of the payout by the defendant once you net it all out goes to the lawyers. That's the argument I find more as it were difficult for in supporting the settlement. Yes, sir. In fact, that's exactly what I believe is a mathematical calculation that can be made from this record which the district court didn't see. You also have the unique set of circumstances that the contractual agreement itself had the Plaintiff's counsel agreeing to use its best efforts to get the settlement finally approved through and including appeal and that the defendants paid the Plaintiff's counsel's attorney's fees to defend it here today. You also have the situation that the negotiation of the amended plan of distribution, it was not a neutral. Can I back you up for just a minute? Is that in the record? Yes, sir. Where? We actually cited to it. Yeah, where is it? The provisions of the settlement agreement were specific. Plaintiff's counsel to use best efforts to get the settlement agreement approved. That was finally approved. And it specifically states that the $24 million attorney's fees award paid by the defendant would include the Plaintiff's appellate attorney's fees in support of the settlement. Oh, I see. But this is just generally a general part of the attorney's fees. I see. So there's not some separate agreement to pay appeal fees on appeal. No. It's a pro – it's a – those are specific provisions of the settlement agreement. Okay. Like I said, here we have the negotiation of an amendment to the plan of reorganization. This came a year or so after the time in which to opt out or to object and came after the first Fairness Hearing when the Court would not approve the plan of allocation because it would not have a sufficient number of products so that each person should go. It was Plaintiff's counsel. It was not the special master. It was not the defendants. It was not the objectors. It was Plaintiff's counsel that said, well, let's leave it alone. Let's use the same $175 million worth of product. Let's use the same product unit cost. But what we'll do is we'll cut it down so that, in fact, none of the class members can get more than one. That is the Supreme Court's view of with a fee close in hand, counsel lose its vigor to press for all that the defendants would pay. By the way, the defendants had said they would pay for no more. And rather of threatening to sue, which is what the Supreme Court in Ortiz said was the leverage, simply suggested itself that the multi-transaction members that it had just negotiated multiple recoveries for give it up. If I may at this time, unless you have further questions, I'd like to reserve the remainder of my time. Okay. Good morning, Your Honor. Joseph Cooper speaking on behalf of the class plaintiffs. Are you going to divide up argument? Your Honor. Are you going to divide argument? You've got a lot of people sitting there. Yes, I am. How are you going to do that? That's what I was about to say. Okay. Mr. Uhrman is representing the defendants, and we've divided the argument in half for a minute each. I will be addressing actually the bond issue, the reference issue, and the issue with regard to the adequacy of representation. And Mr. Uhrman will be addressing the questions with regard to the fairness of the distribution plan and the renotice issue. And I am struck, Your Honor, that this is an appeal, two appeals, not just one appeal. The first appeal is the one that was addressed by counsel, but there is an appeal that was taken from the court's order directing that a bond be paid. Yes, I think that's pretty clear in the briefs. I think we understand that more or less from what's been writing in front of us, that the actual structure of the settlement may be a more productive way to spend our time here. But do you, Your Honor, want to hear anything with regard to the appointment of the master? Speaking for myself, no. No. Fine, Your Honor. Well, then I think that the issue with regard to the adequacy of representation is one where there has never been a case where the differences between the class of damages, when you talk about Ortiz or ANCAM, as Your Honor pointed out, the differences which required subclassing were one set. Well, as I indicated to you, my problem is not that, although my fellow judges may stick on that point. To the extent I've got a problem, it has to do with how much money goes to the lawyers on the plaintiff's side compared to how much is this settlement net going to cost to the defendant. And maybe one way to get into this is to quote Mr. Scarpulla in a New York Sun article on January 13, 2004, who describes the attitude of the defendant toward this settlement as, quote, they are delighted, close quote. I'm sure they were. They're delighted. They do this all the time. In other words, hand out stuff. Well, I'm not certain, Your Honor, what he was referring to. I'm not even sure. Well, yes, you do. You've read that. I'm sure you've read that article. Actually, I haven't, Your Honor. I recommend it to you. It's on page 2549 of the excerpts of record. Okay. Your Honor, the point with regard to the attorney's fees is, first of all, that there were no discussions, and the record is absolutely clear, that there were no discussions about attorney's fees prior to the settlement-reaching resolution with regard to the benefit to be given to the class. In fact, there is no objection, as I understand it, that the totality of the components of the settlement, the product, the injunction, the defendants paying the cost of notice and administration, the defendants assuming the cost of distributing the product. To my knowledge, there is no objection that says that that total settlement and all its components is inadequate. I believe the law, and I believe Mr. Uriman was going to address this, but I believe the law is clear that in valuing the settlement, when you're talking about a product, you do it with regard to the value to the recipient, not to the benefit. And so it depends on what you're trying to do. If you're trying to figure out fairness of the settlement, which is one of the things you're trying to figure out is, did the plaintiff's lawyers try hard enough, one of the things you might want to look at is how much pain is inflicted on the other side. Well, Your Honor, let me talk about that. I mean, that's lawyer talk. We all know this, right? Well, the point is, Your Honor, there is — first of all, there is nothing in the record with regard to the cost to the defendants of producing the product. Well, you know, if there's nothing in the record, that causes me problems. How can I judge the fairness of the settlement if there's nothing in the record with respect to that? Well, the — Maybe you can find something in the record, because there is some. Well, I don't believe there's anything in the record, Your Honor, from the defendants who would have this information. That's what I was referring to. Okay. Well, that may not be a good point. That may be a bad point. If we can't — if we don't — if we have no idea how much this is costing the defendants, I mean, how do we evaluate, then, how hard you pushed them? Well, Your Honor, let me talk about how hard they were pushed. Their — this litigation was started 10 years ago by a group of lawyers after the request that the various attorneys general, particularly the Attorney General of California, looked into it and had declined. The litigation went on for many years. There was — Judge Renfrew was actually appointed to be a discovery master in connection with the ongoing litigation, which is why he became the master in connection with the settlement. But the litigation went through many depositions, millions of pages of documents produced, attempts at resolving it through jams, mediation that was unsuccessful. And eventually, with motions for summary judgment pending, we were able to reach an agreement with regard to making this settlement, and it's been reflected in the documents and the components we've talked about. The defendants — But we have no idea how much this is costing the defendants except for the $24 million that's going to the plaintiff's lawyers? Well, we know that it's costing them all of the costs of notice. We know that it's costing them the cost of administration. We know that it's costing them the amounts necessary to distribute the product. We do not know the precise amount of the cost of the product, but we know that the product is being specially manufactured and packaged for this purpose in order that the amounts being given away would have the values that are required. Well, there must have been some way that the $175 million was arrived at. It was arrived at via a negotiation over the value to be given to the class. Yeah. And that value is based on the retail value of the product. I see. And what we don't know is how much it costs the manufacturers to produce and distribute that product to the stores for handing it out. We do not know that amount, no, Your Honor. Is there a relevance to this case in that cost? I don't believe there is, Your Honor. I believe that the relevant consideration is the value to the class. The class will be getting value. There's no issue about that of $175 million for product. No, there's a major issue about that, too, because we don't know how many people will actually show up to pick up what could be as much as $175 million manufactured suggested retail price. The moment it's set for a one-week distribution? It is, Your Honor. What happens if at the end of the week, only, I'm just making up the number, 20% of the $175 million worth of retail price has been handed out? That's it? The rest of it just goes to an unnamed charity? Well, it goes to charities that would be related to people who have a need. I mean, it could go to homeless women charities, to... The short answer is yes. That is to say, if only 20% has been picked up at the end of the week, it goes to charity. That is correct, Your Honor. Has there been any consideration as part of the settlement if it turns out that your take rate is that low of extending the period? Well, there were considerations of all of these things, Your Honor. There were considerations through the entire approval process of whether or not it should be one product, limited to one product or not. There was extensive consideration by both the special master twice and the judge twice with regard to what the take rate was like. Now, as I understand the final plan as approved by the special master in his first recommendation of approval up to the district judge, there was going to be something like $400,000 in change spent on notice to the class that you can come pick up your stuff. Is that right? There is a plan to notify the class when the product is available. Correct. It consists of two components. Well, I'm asking about the plan not as it now exists. I'm asking about the plan as it was originally approved by the special master and as it came up to Judge Armstrong. At that time, was it anticipated that something over $400,000 would have been spent on the notice? I can't tell you what the dollar amount was, Your Honor. That also is in the record. Well, the original plan was for the re-advertisement in the 50 largest markets that the product was available. Right. And in addition, that anyone who had signed up and registered for the to receive it would get either a postcard or an Internet message telling them that the product was available. And how many people are those? There are, at the last count, I believe it was 671,000, I believe is the number in the record. Who signed up to ask to receive it? That's correct, Your Honor. The number has undoubtedly changed because I believe it's going up, but I don't know what the new number is. And I'm on page 2634 of the excerpts. Apparently, $460,000 was allocated for advertising. And what was that advertising going to look like? Your Honor, I believe that that advertising, when it was going to occur, would have been drafted at that time. It was to be an advertising that was comparable to the original notice telling people that now the product was available. In the original notice, as I understand it, shows up in the back pages of various magazines. Is that right? I don't believe so. Newspapers and newspapers. It's in the magazines and the newspapers. In the back pages? I can't tell you. It was scattered through the newspapers. There's an awful lot you can't tell me. And you've spent a lot more time with this case than I have, and there's some things that I seem to be telling you. I mean, why can't you tell me where it showed up, where these showed up? Well, Your Honor, I saw them not on the back page. If you're telling me you saw them on the back page, I can't say there weren't any on the back page. But when I looked at them in the various magazines, I didn't see any on the back page. Did they have pictures? There weren't pictures, no, I don't believe you, Your Honor. They were just legal notices. Texts. Yeah, I've seen. I read the text. It didn't seem to have a picture. What I'm after is, it doesn't strike me as the $460,000 spent on newspaper advertising in these large markets is very likely to reach very many people. And what I'm after is, as it was originally approved by the master, it didn't seem to me that the publicity to the people who were supposed to come in and get their free gifts was going to be very effective. I do notice that Judge Armstrong focused on this, and as a consequence of that, the settlement now includes notification actually at the counters. Is that correct? That's correct, Your Honor. But I'm trying to judge, okay, the special master signs off on something that seems to me that has pretty slender notice, not likely to produce huge crowds at these counters. So I come back to the question, well, what happens if at the end of the week we've only had a 20% take rate, 20% of the $175 million? There's no provision in there for extending it? There is not a provision for extending it, Your Honor. That doesn't mean it can't be extended. There is a procedure. Well, the only way it would be extended if there's, I assume it's part of the settlement, you're not going to just voluntarily extend that without it being part of the settlement. You're not telling me that, are you? No, Your Honor. But if the product is left, and if there are still people standing there and coming in the next day, I don't believe there's anything that would preclude that person who comes in the next day from, and saying they wanted a product, if product was available, being given that product. The settlement doesn't provide for that? Following Judge Fletcher's questioning, our standard review is abuse of discretion. Yes, it is. Are we doing a de novo review now? In other words, when we get down into the nitty-gritty of how it works, absent the fact that the essential elements are in place, when we get down to nitty-gritty, are we doing a de novo review or are we doing an abuse of discretion review? I believe you're doing an abuse of discretion, Your Honor. I know, but when we get to the nitty-gritty, is that a de novo review or is that an abuse of discretion? I believe it's an abuse of discretion in the nitty-gritty. So we can go down into every detail and recheck every detail in exercising our review on abuse of discretion? I believe it would be an abuse of discretion standard, yes, Your Honor. Well, I know it's abuse of discretion, but does that mean we can look at every nitty-gritty detail of everybody's action and rejudge those and remake the agreement? Is that an abuse of discretion review or is that a de novo review? He just threw you a life preserver. I'm not certain that I'm understanding the question, but you're nodding. What I'm saying is if we go back and reengineer the agreement, aren't we doing a de novo review? You look at the settlement agreement in its totality for abuse of discretion. Okay. Let's hear from you. You've got a co-counsel. Could I say one last thing, though, Your Honor, which goes back to this question of fees? As I said before, there is nothing in the record which you're really cutting into your co-counsel's time. Thank you, Your Honor. Your Honor, my name is Frederick Urim, and I represent the Estee Lauder Companies, and I'm speaking for the defendant, Appelese. Let me turn directly to Judge Brunetti's point. Yes, I do believe that it goes beyond your typical and normal judging for abuse of discretion for you to count up the number of advertisements or, with all respect, decide whether they're on the back page or the middle page. That's my biggest problem here. If we have a problem, this is not a summary judgment. This is what happens here is that the parties got together and made a settlement by using the various processes. They then submitted to a judge to look it over. Now, we're at the next level, and if we're going to go back and remanufacture every detail, I want to know how we do that in light of the fact that we're reviewing this for abuse of discretion. And I understand and obviously I agree, Your Honor. I accept the life preserver. But do let me respond. You're taking it out of the seat too far. The point is I'd like a little discretion on your part to tell me that because I want to figure out how I go through this abuse of discretion review on this big record, because we could go on forever doing this, and we could actually, very frankly, redo the settlement for it if you want. But the point is we're on abuse of discretion. Let me throw you a life preserver if I can. And really, I do want to respond to Judge Fletcher, because Judge Fletcher is correctly and quite obviously trying to make sure that you can, in reviewing this, feel comfortable that this was fair, that it does make sense, that it is practical and feasible. And obviously, that's your job. What's been left out of this entire discussion so far is one very, very critical fact, and that was the presence of the State's attorneys general. This was a very complicated, difficult, and in many respects unusual case and settlement We had 38 million class members. It was a very long class period that we're dealing with, with almost 10 years. One of the features of this was, aside from the fact, well, let me start from the beginning. We did this settlement. We published the notice. The original notice, Your Honor, was published, as you know, in lots of magazines, and it was, as I recall, it was basically all over the magazines. And some of it was on the rear page, and some of it was in the middle. It was very, very prominent. In fact, it was done by a very, very reputable and well-known company that administers these things, and we had something like a 91 percent reach, which is enormous. Now, you don't mean reach 20 percent, 91 percent reading rate. You meant the physical obligation that gets into 91 percent of households and class members. You're too good at this. You're absolutely right. That's what reach means. Yeah, you do. But it's the best you can do it. I mean, that's how they judge these. It is the best you can do it, but I have to say that I wish you had said it that way instead of making me say it. Well, Your Honor, I said reach, and that's the way they judge these things. I certainly didn't mean to mislead you. But you don't mean you actually reached the people. You mean the publication gets into a household. Gets into a household, and that's exactly what reach means. That's right. And they – and now, with caution, I'd also say we had a 4.4-time – I read that, too. Yeah, and we could all try to figure what that means. These are the best objective standards you have. These are used all over the industry. Yes, sir. What bothers me is there's a lot of statistics being used because they had – you can't get precise on this. So if you look at the record, they had to decide how many people are going to pick this up, where is it going to go. When you're giving away free cosmetics, does anybody believe that not everybody would know about it? Let me tell you. Was that discussed, the fact that you're giving free cosmetics and the world is going to go upside down? That's exactly the case. And I don't want to go outside the record, but there's barely a week that goes by. What's in the record? Because – Well, I think it was always clear – Outside the record, I go to my wife, and if I told her free cosmetics, she'd do flips. So – Well, again, let me come back – Let me come back to the State Attorneys General. I think because for Your Honor's comfort here, what we had was we had only 71 objectives, which is really kind of amazing in a class this size. And I think is something of a testament to the value of the settlement. And we only had, I think, 62 opt-outs in a class this size. But on the other hand, we did have the 11 States Attorneys General who were concerned about this because they get concerned about consumer class actions. And what I'd like to know is – and I think this is going to turn out to be a point in your favor. I mean, I read the Attorney General's presentation to Judge Renfrew at the first rather chaotic settlement hearing with babies crying in the background. Oh, you had that, yes. We heard all that, too. I read that. But there was a – Ms. Kirk, you know, she was very eloquent in her objections. Yes, that's right. Tell me why – tell us why the States Attorney General and when they quit objecting. Well, and that's a great question because what I was about – for you, I was about – well, it's a softball because I was about to say that if you read the States Attorneys General's original position, you will know that they certainly were in no way in our pocket or anything like that. They were deeply skeptical of this settlement. They're deeply skeptical of how people deal in this kind of a situation with their constituents, the millions of people who live in their state. And they put us through a wringer like I don't think any other class settlement has ever been put through. So, for example, you were talking about the value and the cost. It is correct there is no exact number for what the defendants' cost of producing these products are. But it is $175 million worth of products. And what the State AGs did, for example, is we said we were selling our normal legitimate products, which is what we're going to do, we're going to give away, and we're valuing them at the same price we typically sell them to consumers, who you know you're getting values. And we never put in the record for a lot of different reasons why – what our absolute cost is that's confidential. Also, as a matter of law, Your Honor, respectfully, I think the standard is you judge the benefits of the class. You don't judge the cost of the plaintiff. So no one ever pressed us. I beg to differ if you're at a – if you're at a fairness hearing. Well, all right. But that's where the record remains, and I don't want to mislead you. So we never put in our exact number. But I think the Court can take judicial notice that if these are our normal, everyday sale products, which are being sold at our normal everyday price, we have a very, very substantial cost of producing those products out of that $175 million of retail value. So this was hardly without penalty to us. This is a major cost to us, to produce those products, plus the cost of notice, which was several million dollars, plus the cost of administration, plus the cost of administering this entire settlement. So there was a very large number to us. And I ask you to weigh that, as I know Your Honor should, against the weakness of the case, because this is also an extraordinarily weak case. And I think one of the other major features of this settlement that you should take notice of is that there have been a lot of little questions raised by Wilkinson, by the appellant here. But the one thing no objector, not one of the 71, not one of the State's attorneys general, no one ever questioned the adequacy of the settlement, the $175 million cap, which we insisted upon maintaining as being fair, reasonable, and adequate for the settlement of this case, because, judges, it is a spurious case, and it is only fair that we be able to settle it for that amount of money. Indeed, I think everyone recognizes this is a generous settlement for the class. Kennedy, being the whole class didn't object, and being the agreement was approved by the judge, how do we look at Wilkinson, then? In other words, she's bringing this up. What do we do in our abuse of discretion? Well, I think it's very easy. She's trying to nitpick this thing on issues that were thoroughly, I mean, more than thoroughly. I'm delighted that Your Honor should have read the record, because more than thoroughly reviewed in every single aspect, first by the counsel and all of the objectors, and most importantly, by the State's attorneys general, I mean, just as an example. I think you've gotten distracted in answering my question. Yeah, I want to come back to you. Yeah. Because there was a point at which the State's attorneys general were objecting vigorously. Why did they turn around? Because they had real questions. Why and when did they turn around? They had real questions as to whether the – I don't want to read their minds, but let me give you the best I can give you. They had serious questions about the real value of what we were doing. They were concerned that maybe we would just be giving away trinkets. Maybe when we said we were giving real products, we wouldn't be giving real products. Maybe we'd be giving away junk. Maybe we'd be giving away stuff that had expired. Stuff you would be giving away anyway. I remember that part of it. Yeah. And in fact, what we did was we went through, before Judge Renfrew, we went through extensive hearings and lots of papers, filed paper after paper, describing specifically which products, exactly what we were doing, what the retail price was, how it was, what it was going to be inside it, what the size was. And then the State's attorneys general – I'm not sure this is clearly in the record. I mean, it would probably come out if you read the transcripts closely. They went out and they went to the stores and checked us. And they came back and we had, I don't remember, 25 different products that are part of this thing, because different manufacturers are doing different things. And they said, well, wait a second. On number 17, you're saying that it was this and it cost that and you were wrong. It turned out they happened to be wrong. They misread a price on something or they misread a quantity. They mistook, I remember specifically, we were giving away perfume and we had it valued at $25 for a certain amount of perfume. And they came back complaining, well, wait a second, I saw that for $25 for 10 ounces and you're only giving away 2 ounces. This is phony. Well, the mistake was they were looking at eau de cologne, toilet water, and we were giving away perfume, so they mistook what we were doing. They fly-spec this thing the way a State's Attorney's General can fly-spec this kind of an arrangement. But the good news from our perspective is, yes, Your Honor, we are used to this. We frequently do giveaways. We know how to do it right. We know when we value a product, we know we have to do it fairly and honestly. And one of the things I think the State's Attorney's General finally became happy with, number one, was that we were giving real value to consumers. They were each going to get a significant and valuable product, not some trinket, not a 25-cent check that would be thrown away and that no one would do, and that after months of discussions about how else we could do it, they became persuaded that this was the single best way to give as much value as possible to as many people as possible, and that no other way. And we explored. And that's what Judge Armstrong sent us back, if you recall, at the end of the first hearing. She liked everything about the settlement, except she wasn't convinced that this was the best way, just as you're sitting here today. And it goes to your point, Judge Brunetti. At what point do you say, okay, enough is enough, we've got to rely on the district judge? Well, look what the district judge did here. She sat there as skeptical as you are, and she said to us, well, I'm not yet convinced. Go back and work on it some more. So we did. And we finally came back with those modifications. The modifications were, of course, one to a customer, and we proved to the State attorneys, you know, coming back, what turned them around? When they really started looking at participation rates carefully, and we really started examining what we'd expect would happen here, they were persuaded, yeah, there is enough for everybody here. This is fair, and there's no better way to do this. So that turned them around. And I think they also, to be honest, and in all modesty, I think they became turned around because they realized that this was a very professional and good-faith effort to do the right thing in this settlement. We had been working for months, and I'll take some pride in this. I've never worked so hard on a settlement in my life to put this deal together, coordinating among eight manufacturers, plus the plaintiffs, plus the objectors, plus the AGs, plus Judge Renfrew, plus Judge Armstrong. It was the hardest thing we've ever put together to satisfy everyone. But we did. And we never, I've never seen one that people looked at so carefully and were so skeptical of, as you are, and properly, because it's a big deal and it needs to be done right. So I think that's the bottom line for your answer. Yes, they got persuaded this was fair, reasonable, adequate, and the best we could do. Now, obviously, one of the questions has been, and this was behind, to only put it at the last step before it comes up to us, this was in Judge Armstrong's mind, trying to figure out, okay, how many people are going to show up to claim this distribution? And she's worried that there'll be too many people. So if some people get several product, there won't be enough left, so we'll go back to one per person. And she's also worried, I guess, about the adequacy of the publicity. So she asked that there be, so that there apparently is now not merely- Improve the back end notice, exactly. Move the back end notice so that maybe we'll get some more people in, each to claim one. Precisely. I continue to have the question, and it is a fly spec, I admit it. This is guesswork as to how many people are going to show up. You know, Your Honor- But what if it turns out that you end up with a lot of extra product at the end of the week? Then what? Our plan is to stay with the terms of the settlement, Your Honor. We – this is the – this was the – the structure was – you must have some finality in this thing. We need to know what we're doing. This is a huge undertaking. Yes, sir. Doesn't that get distributed to charity? Oh, yes, but I think – I think Judge Fletcher knows that, but he was saying, but why don't you just run it on longer? This is- Also, I'm asking, was the answer I got a moment ago, that there's nothing to prevent from going later in spur distribution. My instinct is that's never going to happen because you'll just stick to the settlement. Well, you know, I'm not going to speculate, Your Honor. I certainly reserve – I think we all need to reserve the right to stay with the settlement, and I certainly, certainly do. What will happen – and you should also know- I have to say I would be unhappy if the answer would be all of a sudden, oh, you don't like something right here on appeal, we're not going to stick with the settlement. No, it's either the settlement or you redo the settlement. Yeah, I know. But one of the things – just to give Your Honors yet another assurance, one of the things that was – the final modification that we haven't mentioned yet was the monitoring committee. What we all agreed to do is when we actually do the settlement, and just to make sure – and this was, frankly, the State Attorneys General, who were the strongest proponent of this – they've created a committee of the AG, the objectors, and the plaintiffs who are going to monitor how – exactly how we implement this, what the mechanics are going to be in terms of how we implement this. We're not on our own on this thing. And so we're going to be monitoring that committee with Judge Renfrew as the special master monitoring that committee, and, of course, Judge Armstrong has retained jurisdiction through the consummation of the deal. So it's another assurance of fairness for you and another reason why I don't think you need to flyspeck every detail. Any further questions from the bench? I just might say that I'm kind of frustrated with the oral argument because, to me, the essential thing is the overall agreement. Yes, sir. The first thing I would like to say is that the $175,000 is appropriate, the $175,000 settlement, whether the $175,000 is appropriate, hundreds of millions. Second, what the importance and effect of the injunction is, because that could affect way more people than we're talking about here. And the third is the weakness and the reason why it was weak of the case, because that obviously was being taken into consideration by the master and the district attorney. And the last thing is the effectiveness of the notice, and I, frankly, haven't heard much discussion of any of those. And I'm not meaning we should discuss it now, but I'll just express my frustration in looking at the case, and, you know, we got a lot of record and a lot of briefs, but I don't think we've touched real well on some of those things. I'm here. If you'd like to respond. I'll respond to anything Your Honors want. I mean, my job is to persuade you that this is a fair and reasonable settlement. Why is $175 million appropriate? Your Honors, this was a very, very weak case. We went through a great deal of discovery, depositions. We produced a million documents. They copied 600,000. We litigated this very hard. Two of the defendants had already moved for summary judgment by the time we got into the settlement conversations, which didn't begin until we had litigated this case for several years. I need to even remind you, under the case law, all of that is significant. This is not something where they filed a complaint and we immediately huddled and said let's make a deal. We fought this case real hard, and I think essentially the defendants proved to the plaintiffs, you've got no case, you have no evidence, you've got no hard evidence of conspiracy, you have no hard evidence in this case that will let you prove anything. And in fact, we think we're going to end up with summary judgment. We ended up before the State court. We started this in the State court. The State court had sent us to mediation. We ended up with an excellent mediator, Danny Weinstein. We mediated, I think, a year or two years. We tried to get this thing settled. It was very, very difficult. We felt this case was worth very, very little. The defendants were holding out like crazy for huge amounts of money. And we finally, finally settled on 175. One of the things, in product, one of the things that came out, and it's in the record, is they did a litigation analysis, the plaintiffs did a litigation analysis, and their own litigation analysis established to them that they had something like a 7 percent chance of winning. So I think, in answer to your question, I can go through the facts of the record. The weakness of this case is there's no evidence that we did anything wrong, and I'll say it on the record, because we didn't do anything wrong. We abide by the law. We'll always abide by the law. So, but you have that 7 percent number in their own litigation risk analysis. That's why the case is weak. The $175 million of product is going to be given to somebody. It's going to be given, yes. It will go at least to the class members, and if there's left, it will go, I pray, hopefully to places where it will be very, very useful and people will value it. Well, then, the second thing is, what's the significance of the injunction? Well, the injunction is significant, Your Honor. There was an affidavit put in, and this is in the record, by the declaration we call it here, by the former Deputy Attorney General of the State of California for Antitrust Matters, who evaluated our injunctive relief, and his opinion was that it was very significant. This is not one of those cases where you had an injunction that said you got to do what you got to do, what you always had to do anyway. He valued this as very significant, and I think, and no one has questioned. There's not a, there's not a, no one controverted that declaration, not a single objector, or the AGs, for that matter, have said, you know, have come in and said, no, no, no, there's no real injunctive relief here. This is a significant injunction, and it has significant, it has a significant effect. It has a far-reaching effect in the sense that it deals with vertical relationships, which could be in a state of flux. So this is not a small matter, and there's no question, and no one has ever contested, I mean, not even Appellant, the value of this injunction. And that injunction goes to everyone, no matter what. The last thing is the effectiveness of the notice. Well, without, I'm not going to use any statistics, but unfortunately, it's the only way we have. I mean, maybe there's something better, Your Honor, but I'm not familiar with it. How was it derived? What, how is it derived? These are highly professional. You know, we used a very highly professional firm to do this. What was the name again? Concella. And I'm sure you've seen the name around. I mean, these are very, very good people. And we basically paid them several million dollars and said, get it done. The last thing in the world you want to do, and here it is happening to me, is go through this whole settlement and stand up before a court, and they look at you and say, boy, that was a chintzy notice. What's the matter with you? Why didn't you do better? We said, do the best notice we can do here. They designed the notice program for us. We were in 11. I think I even brought up the list because I didn't want anyone to say I didn't know what happened. But something like 11 national publications, I mean, major, major publications all over the country. It was a very substantial notice by the objective statistical methods that are used. And it's the same thing that Procter & Gamble and General Motors rely on, Your Honor. It's because it's the best you got. Kennedy. Well, it's in the first time notice has been given in a class action suit. You've got a whole business and an industry building around how you do these things. Exactly. As I read the record, you used the business industry standards. We did the best we could do. I mean, you're all making an estimate anyway, so you used the best science you've got, I guess. That's what I'm saying. We did the best we could. There was nothing that was held back. Okay. That answers my questions. Okay. Do you remember the question, Judge Panetti? Thank you for the opportunity. I think I apologize for monopolizing the conversation until we get to this point. Okay. Thank you very much. Thank you very much, Your Honor. Response. I'm glad you can go through the record. I appreciate that. It's a heightened scrutiny standard of abuse of discretion. This Court has said so in Hamlin. The Supreme Court said it in Amkin. This Court said it in Stanton. It's also an abuse of discretion when the Court acts without evidence. As the Court has elicited today and the record establishes, well, if there's nothing in the record as to what the penalty was for the defendant, then the trial court abused their discretion in approving it. Because there was nothing in the record to show that the defendants are suffering some sort of penalty. I'm an officer of the Court, and I take that very seriously. There is that one item that I cited the Court to where there is speculation as to what the product cost is. We can get into cost, I guess, but you're just saying that without cost, there's a defect in the record. That's what you're saying. At a minimum, it's abuse of discretion for the Court to approve it without any evidence of what it cost. Why is it abuse of discretion? Is it an error of law? Is it an error of fact? You have to have something under the abuse of discretion. Well, I look, and I believe it's Molsky where you all said that you needed to consider in the analysis, which I believe is a directive of the factors, which is a legal issue, that the review needed to look at the penalty, whether it was little or no penalty, to the settling defendant. If that, then, is a directive of a factor and there's no evidence one way or the other on the factor and they rule in favor of the settlement, then, yes, that's abuse of discretion. But that's a lot of words. You're saying that the relationship to cost to the fair market value has got a relationship to the penalty. Is that what you're trying to tell me? Yes, sir. The only penalty, the way you all use that phrase, excuse my y'alls, the only way you use that phrase in Molsky was what it cost the defendant. If you notice, when Plaintiff's counsel was examined on this issue, he said that he had cited cases where it was not the value, it was not the cost to the defendant, but the value to the class that was the relevant factor. Every one of those cases is talking about justifying the attorney's fees. Not one of them is addressing whether or not it's a fair settlement. So, yes, in Molsky, you all said look to the penalty to the defendant in determining the fairness of the settlement. And if you don't know what it cost the defendant, if there's nothing in the record, then the trial court acted without any evidence, and that, under traditional abuse of discretion standard, is abuse of discretion. Similarly, the other thing that's important is what it costs, as opposed to the retail value of the product. Because the Supreme Court has said that what now courts need to be doing is looking for indicia, both the structure to show that there wasn't either faintheartedness, I hate these phrases, but this is what the courts say. Collusion? That's black letter law. But let's get down to a case. What does the case say when we're talking about award amounts? You've cited that there are cases that say that the value to the consumer is critical when deciding or is important when deciding attorney's fees. But you haven't cited the case that says, well, you've got to value the cost of the product versus the retail value when you're determining fairness of the settlement amount. Well, Molsky … In general law. Okay. Molsky has a proposition of law in a case where the application was what was the defendant out of pocket. That's as close as I can get. Okay. But it makes sense that if you have a very low out-of-pocket cost, even if it has what seems to be a high value, that you have the potential for it being fainthearted advocacy, which is what this is all about under Amkim and Ortiz. It's whether or not the absent class members got that vigorous representation that you would get when you have a one-on-one plaintiff and attorney where the plaintiff is watching the store. Do you mean there's a realistic possibility that there's going to be a plaintiff suing to get a $25 product or something that … It just seems to me I can't see the any likelihood of individual plaintiffs here, I can in the health situations, but individual plaintiffs here suing for $25 or $225? That's the very nature of class actions, that it provides a mechanism for small-dollar claims to be adjudicated on a non-present-in-the-courtroom procedure. But that Rules Enabling Act, which you all and the Supreme Court has come back to, is we don't do a different brand of justice just because it's a class action. You have to do justice in the traditional way. You would no more … A judgment is what you get when you go to court in an individual case. It's either a take-nothing judgment or a grant something. With all due respect, this is a good jury argument, but we're talking about reviewing years and years of work on abuse of discretion, and that may talk about the structure of what we do, but we're talking about this case. Okay, if I may, one response. I believe it was the Supreme Court, when it reversed in Amchem, there had been five weeks of comprehensive hearings and 300 findings of facts had been made. Yes, it is a heightened abuse of discretion standard. Thank you. Okay. Thank all counsel for this. The case of Wilkinson v. Azizian is now submitted for decision, and we are in recess until tomorrow morning. Thank you. All rise. This court for the session stands adjourned.
judges: Hug, Brunetti, W. Fletcher